## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Luis S.R.,

        Petitioner,

v.

Markwayne Mullin, *Secretary, Department of Homeland Security*, Todd Blanche, *Acting Attorney General*, Todd M. Lyons, *Acting Director, Immigration and Customs Enforcement*, and David Easterwood, *Acting Director, St. Paul Field Office Immigration and Customs Enforcement*,

        Respondents.

Case No. 26-cv-2642 (NEB/DJF)

### REPORT AND RECOMMENDATION

This matter is before the Court on Petitioner Luis S.R.'s[1] Petition for Writ of Habeas Corpus (ECF No. 1) ("Petition").  Luis seeks an order directing Respondents to release him immediately.  As discussed below, the Court finds 8 U.S.C. § 1231 does not justify Luis's continued detention and recommends the Petition be granted on that ground.

### BACKGROUND

Luis is a Cuban citizen who entered the United States in 1980 as a refugee from Cuba.  (ECF No. 1 at 4.)  At that time, he was 23 years old.  (*Id*.)  He later became a lawful permanent resident of the United Status, retroactive to his date of entry.  (*Id*.)  However, on March 25, 1986, an immigration judge in Buffalo, New York entered an order of removal against Luis after he was convicted of robbery with a deadly weapon and possession of a firearm.  (ECF No. 8-3.)  The government detained Luis after his removal order and later released him on parole on September 27,

---

[1] This District has adopted a policy of using only the first name and last initial of any nongovernmental parties in orders in immigration matters.

1990.  *See Luis S.R. v. Immigration and Custom Enforcement,* No. 26-cv-1482 (JWB/ECW) ("*Luis I*") (ECF No. 4 at 2) (D. Minn. Feb. 23, 2026).  The government revoked Luis's parole on February 19, 1998, after he was convicted of another felony offense, and took him into custody on February 27, 1998.  (*Id*. at 2-3.)  The government released Luis on parole again on April 1, 1999, but he was again convicted on or about February 9, 2001 and sentenced to 200 months of incarceration.  (*Id*. at 3.)  On July 5, 2017, the government detained Luis again following new criminal charges, which were dropped, and then released him on an Order of Supervision (OSUP).  (*Id*.)  Cuba refused to repatriate Luis during each of his immigration detentions.  (ECF No. 1 at 6.)

Given Luis's Cuban citizenship, the government's failure to successfully deport him is not surprising.  For many decades, Cuba refused to accept deportees from the United States entirely.  (*Id*. at 4-5.)  That has now changed, but not a lot.  Cuba currently accepts roughly one deportation flight per month from the United States.  (*Id*. at 5.)  Cuba's limited acceptance of deportees has meant that the government eventually releases the vast majority of Cuban refugees with final deportation orders under parole orders or orders of supervision.  (*Id*.)

On or around July 22, 2025, Luis attempted to flee to Canada, but he was denied entry and then arrested and detained by Immigration and Customs Enforcement ("ICE").  (*Id*. at 6); *Luis I* (ECF No. 4 at 3-4).  He has been in ICE detention since that date.  (ECF No. 1 at 3.)

On February 17, 2026, Luis filed his first habeas petition for his release.  *Luis I* (ECF No. 1); *see also Luis I* (ECF No. 12, amended petition).  Luis did not dispute the validity of his final deportation order but argued his release was required under *Zadvydas v. Davis*, 533 U.S. 678 (2001), because there was "no significant likelihood of removal in the reasonably foreseeable future."  *Luis I* (ECF No. 12 at 2-3).  In response to the petition, Respondents stated they had determined that Cuba would not accept Petitioner, but that Mexico was accepting some Cuban citizens through third-

2

country removal procedures on a case-by-case basis.  *Luis I* (ECF No. 22 at 3).  Respondents

proffered a sworn declaration from Deportation Officer Angela Minner ("Officer Minner"), which

stated:

> [T]he process for presenting Cubans and other third-country nationals to Mexico is handled by the removal coordination units at respective ERO offices in Texas, New Mexico, Arizona, and California.  Mexico has not previously denied or accepted [Petitioner] and the presentation to Mexican immigration is handled by the border facility.  To the best of my knowledge, travel documents are not required and no diplomatic assurances or other acceptance materials have been sought or obtained in advance, as this process is mediated by the border ERO offices at or near the time of presentation.

*Luis I* (ECF No. 17 at 1-2).

Based on Respondents' representation that they would present Luis to Mexican immigration

officials for removal within 1-2 weeks, Magistrate Judge Elizabeth Cowan Wright found

Respondents had "shown a significant likelihood of removing Petitioner to Mexico in the reasonably

foreseeable future" and recommended Luis's petition be denied.  *Luis I* (ECF No. 22 at 10-11).

Judge Blackwell adopted Judge Cowan Wright's *Report and Recommendation* on April 6, 2026 and

denied the petition.  *Luis I* (ECF No. 23).

Luis filed the Petition now before the Court on May 15, 2026.  (ECF No. 1.)  The Petition

asserts that after Luis's first petition was denied, Respondents transferred him to Texas to effectuate

his removal.  (*Id*. at 8.)  However, Respondents were unable to deport Luis to Mexico.  (ECF No. 1

at 8, ECF No. 7 at 2.)  Luis is now 68 years old and suffers from numerous medical issues.  (ECF

No. 1 at 4, 8.)  Luis speculates that this failed deportation was due to these issues, including

"cervical spondylolysis, chronic back pain, Type 2 diabetes, hypertension, osteoarthritis, recently

occurring stomach ulcers, recently occurring gastrointestinal bleeding requiring hospitalization, and

recently occurring anemia."  (ECF No. 1 at 8.)  Luis alleges that, while he was in detention in Texas,

he witnessed many detainees without health issues taken for removal to Mexico and never returned, while Mexico refused to accept other detainees who had serious health issues. (*Id*.)

Respondents contend they were unable to deport Luis because he refused to cooperate. They proffer a new sworn declaration from Officer Minner ("Minner Declaration"), which states that on September 23, 2025, "Petitioner was served a Notice of Third County Removal to Mexico." (ECF No. 8 at 2.) She states that Respondents scheduled Luis for removal to Mexico on April 29, 2026. (*Id*.) She further alleges, however, that "Petitioner refused to comply with removal at El Paso, Texas." (*Id*.)

The Minner Declaration does not describe what Luis did or failed to do to comply with his removal. (*Id*.) However, Respondents attached several exhibits to the Minner Declaration to support their opposition to the Petition. These include an Instruction Sheet to Detainee Regarding Requirement to Assist in Removal ("Instruction Sheet") dated April 29, 2026, which includes a signature line indicating the recipient "refused to sign" it. (ECF No. 8-1 at 1.) According to Officer Minner, Respondents served Luis with this document on May 15, 2026 and will continue to do so until he "cooperates with removal." (ECF No. 8 at 2.) The Instruction Sheet is a form document containing a list of steps a detainee is required to complete within 30 days of receiving the form to "comply with [his] obligation to assist in obtaining a travel document." (ECF No. 8-1 at 1.) It includes 12 check boxes, each identifying a task for recipients to complete, and states that "[m]andatory requirements will be checked off by the ICE officer depending on the facts of each case." (*Id*.) Among the requirements are "[s]ubmit passports (current and expired) to ICE", "[a]pply for travel document/passport from your embassy or consulate", and "[s]olicit permission from another country, which may be able to accept you, to enter that country to affect your removal from the United States." (*Id*.) In Luis's case, none of the "mandatory requirements" boxes have been

4

checked on the form he received.  (*Id*.)

According to Officer Minner, Respondents also provided Luis with a Form I-229(a) "Warning for Failure to Depart".  (ECF No. 8 at 2.)  This document warns recipients of potential penalties for refusing to apply for travel documents or take other steps necessary for their removal. This document is also dated April 29, 2026 and indicates the recipient "refused to sign" it.  (*Id*. at 2.)

After detaining Luis in Texas for about four weeks while they unsuccessfully attempted to remove him to Mexico, Respondents returned him to Minnesota, where he remains detained at the Freeborn County Jail in Albert Lea.  (ECF No. 1 at 8.)  Respondents have continued their efforts to identify a third country that will accept Luis.  Officer Minner states that on May 19, 2026 ICE/ERO St. Paul requested ICE/ERO Headquarters to advise of any alternative third country removal options for Luis and "will continue to counsel [him] regarding his responsibility to cooperate with the removal process under 8 USC 1253."  (ECF No. 8 at 2.)  To date, however, there is no evidence in the record that any third country has agreed to accept him.

The Petition requests an order for Luis's immediate release.  His claims are based on Respondents' alleged violations of: (1.) 8 U.S.C. § 1231; (2.) Fifth Amendment substantive due process; and (3.) Fifth Amendment procedural due process.  (ECF No. 1 at 15-18.)

### DISCUSSION

Respondents argue Luis's detention is authorized under 8 U.S.C. § 1231.  (ECF No. 7 at 3.) 8 U.S.C. § 1231(a) governs the detention, release, and removal of individuals subject to a final order of removal, like Luis.  After the entry of a final order of removal against a noncitizen, the government generally must secure the noncitizen's removal during a 90-day "removal period."  8 U.S.C. § 1231(a)(1)(A).  The statute provides that the government "shall" detain noncitizens during the statutory removal period.  8 U.S.C. § 1231(a)(2).

5

After the statutory removal period expires, detention becomes discretionary.  8 U.S.C. § 1231(a)(6).  But that discretion has limits.  *See Zadvydas*, 533 U.S. at 697.  In *Zadvydas,* the U.S. Supreme Court determined that "read in light of the Constitution's demands," Section 1231(a)(6) "does not permit indefinite detention" but instead "limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States."  *Id.* at 689.  "[F]or the sake of uniform administration in the federal courts," the Supreme Court "recognize[d]" a six-month period when detention is "presumptively reasonable."  *Id.* at 701.  The presumption is not dispositive when a detention is longer than six months, however.  *Id.* ("This 6-month presumption, of course, does not mean that every alien not removed must be released after six months.  To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.").  After six months, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."  *Id.*

Luis has met his threshold burden by providing good reason to believe there is no significant likelihood of his removal in the reasonably foreseeable future.  The parties agree Luis's repatriation to Cuba has not been possible.  (ECF No. 1 at 6, ECF No. 7 at 2.)  The parties further agree Respondents could not effectuate his removal to Mexico, as they promised to do in *Luis I*.  (ECF No. 1 at 8, ECF No. 7 at 2-3.)  There is no dispute that Respondents have abandoned their efforts to deport Luis to Mexico, and there is no evidence in the record to suggest Respondents will be able to deport him to any alternative country.  Officer Minner states that "ICE/ERO St. Paul requested ICE/ERO Headquarters advise of any alternative third country removal options for Petitioner."  (ECF No. 8 at 2.)  However, Officer Minner does not actually name a viable alternative country, nor

establish a likelihood that Respondents could acquire travel documents for Luis's deportation to any such alternative country. "We're working on it" is not enough to establish a significant likelihood of Luis's removal in the reasonably foreseeable future. *See Alian C.L. v. Mullin*, No. 26-cv-2335 (LMP/ECW), 2026 WL 1266167, at *3 (D. Minn. May 8, 2026) ("Courts regularly refuse to find that the Government meets its burden under *Zadvydas* when the Government offers little more than generalizations regarding the likelihood that removal will occur to a third country.") (collecting cases). Luis has been subject to an order of removal for over 40 years and Respondents have not managed to deport him during that time, despite strong reasons for seeking to do so. These facts establish good reason to predict that his imminent removal is unlikely.

Respondents attempt to rebut Luis's threshold showing by arguing their recent failure to deport him to Mexico resulted from his own refusal to comply with the deportation order. (ECF No. 7 at 6.) 8 U.S.C. §1231(a)(1)(C) provides that:

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

"Subsequent to *Zadvydas,* numerous courts have held that, when an alien refuses to cooperate in securing his removal, he can be detained under § 1231(a)(1)(C) for longer than the six-month period that *Zadvydas* established as presumptively reasonable under § 1231(a)(6)." *Hydara v. Gonzales,* No. 07-cv-0941 (PJS/JSM), 2007 WL 2409664, at *2 (D. Minn. Aug. 21, 2007), *aff'd sub nom. Hydara v. Doe,* 324 Fed. Appx. 534 (8th Cir.2009). "These courts have assumed that *Zadvydas* applies to aliens being detained under § 1231(a)(1)(C) and reasoned that, when an alien obstructs his removal, he cannot meet his burden of showing that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* (citing *Lema v. INS,* 341 F.3d 853, 856 (9th Cir. 2003);

7

*Pelich v. INS,* 329 F.3d 1057, 1059-61 (9th Cir.2003); *Davis v. Gonzales,* 482 F.Supp.2d 796, 800-01 (W.D. Tex. 2006); *Powell v. Ashcroft,* 194 F.Supp.2d 209, 212 (E.D.N.Y. 2002)). "The reasoning is that, where the timing of removal is controlled by an uncooperative alien rather than immigration officials, there is no meaningful way to ascertain the likelihood of removal." *Ndenge v. Gonzales,* No. 07-cv-1726 (MJD/JJG), 2008 WL 682091, at *2 (D. Minn. Mar. 6, 2008) (citing *Lema,* 341 F.3d at 856-57; *Hydara,* 2007 WL 2409664; and *Kanteh v. Ridge,* No. 05-cv-313 (DWF/AJB), 2005 WL 1719217 (D. Minn. June 30, 2005)).

Consistent with this reasoning, courts have upheld extended post-removal-period detention under Section 1231(a)(1)(C) when a detainee failed to provide information to immigration authorities needed to secure his removal, *see Pelich,* 329 F.3d at 1059-60 (discussing petitioner's failure to provide information needed by Polish authorities to evaluate his citizenship status), and when a detainee refused to cooperate with the government's efforts to remove him by behaving belligerently and aggressively toward law enforcement officials, *see Akande v. Horgan,* No. 11-cv-11913 (NMG), 2012 WL 1207217 (D. Mass. Apr. 9, 2012) (characterizing petitioner's recalcitrant behavior as failure to cooperate with removal efforts).

Here, Respondents claim Luis "refused to comply with removal at El Paso, Texas", and that his *Zadvydas* claim therefore fails. (ECF No. 7 at 2-4.) However, the record before the Court fails to establish that any lack of compliance on the part of Luis interfered with his removal. Officer Minner states in conclusory fashion that, "On April 29, 2026, Petitioner refused to comply with removal at El Paso, Texas." (ECF No. 8 at 2.) But conspicuously absent from this bald statement, Respondent's briefing, or anywhere else in the record is any description of what, exactly, Luis did or failed to do that constitutes a "refus[al] to comply." Respondents do not contend he refused to submit his passport to ICE, apply for necessary travel documents, or take any other step the Mexican

8

government required to admit him, nor do they claim he behaved in such a belligerent or aggressive manner as to interfere with his removal.

The record reflects that Respondents served Luis with an Instruction Sheet and Form I-229(a), and that he "refused to sign" these forms when he received them. But there is little reason to think the absence of Luis's signature on these forms had anything to do with Mexico's refusal to accept him. There is no dispute that Respondents presented Luis for removal on April 29, 2026. (ECF No. 8 at 2.) And though the Instruction Sheet and I-229(a) are dated April 29, 2026 (*see* ECF No. 8-1), Officer Minner avers that Respondents did not actually serve Luis with these forms until May 15, 2026—more than two weeks after the removal attempt failed. (ECF No. 8 at 2.) His refusal to sign the forms thus could not have had any impact on Mexico's rejection.

Moreover, rather than support Respondents' position, the Instruction Sheet substantially undermines their claim that Luis could have done anything to interfere with his removal. Though the Instruction Sheet lists various "mandatory requirements" that, if checked, Luis would be required complete to cooperate with his removal, none of those requirements are actually checked on the form he received. (ECF No. 8-1.) The Instruction Sheet thus suggests there were no requirements for him to satisfy. This inference is further supported by Respondents' own representations in *Luis I*, in which they stated that travel documents *would not* be necessary to effectuate Luis's deportation. *See Luis I* (ECF No. 17 at 2, "[T]ravel documents are not required and no diplomatic assurances or other acceptance materials have been sought or obtained in advance, as this process is mediated by the border ERO offices at or near the time of presentation."). Indeed, the court denied Luis's challenge in *Luis I* in part based on Respondents' representation that no travel documents would be required. *See Luis I* (ECF No. 22 at 5-6). There is simply no support in this record for the conclusion that Luis's failure to cooperate with obtaining travel documents prevented his removal to Mexico as

9

planned.

The Court could speculate as to other ways in which Luis might have stymied his removal, but that is not the Court's role; it is Respondents' burden to carry. The Court's Order to Show Cause ordered Respondents to provide "[s]uch affidavits and exhibits as are needed to establish the lawfulness and correct duration of Petitioner's detention in light of the issues raised in the habeas petition". (ECF No. 3 at 1.) They have not done so. Respondents' conclusory, factually unsupported assertions of Luis's alleged "noncompliance" do not establish the lawfulness of his continued detention at this point. *See Bah v. Cangemi*, 489 F. Supp. 2d 905, 923 (D. Minn. 2007) (granting petitioner's habeas petition in spite of respondents' "affidavit [consisting] almost entirely of generalities and hypothetical statements").

There appear to be sound reasons to remove Luis, and the Court does not question Respondents' efforts to do so. However, *Zadvydas* dictates that they cannot detain him indefinitely. The Court cannot conclude on this record that there is any likelihood of his removal in the reasonably foreseeable future. The Court therefore recommends that the Petition be granted and that he be released on whatever conditions may be necessary to ensure his appearance if, at any point, permission to remove him to a third country is secured.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Petitioner Luis S.R.'s *Petition for Writ of Habeas Corpus* (ECF No. 1) be **GRANTED.**

2. Respondents be ordered to release Petitioner Luis S.R. from custody:

   A. As soon as practicable;

B.      Inside the State of Minnesota;

C.      At a safe time and place communicated in advance to counsel; and

D.      With ***all*** of Petitioner's personal effects in Respondents' possession, such as driver's license, immigration papers, passport, cell phone, and keys.

Dated: June 4, 2026                                    *s/ Dulce J. Foster*

Dulce J. Foster
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).